JOHN MOOT & another[1] *vs.* DEPARTMENT OF ENVIRONMENTAL PROTECTION & others.[2]

Middlesex. October 3, 2006. - February 12, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Trust,* Public trust. *Department of Environmental Protection. License. Administrative Law,* Agency's authority, Regulations. *Regulation. Real Property,* Restrictions. *Constitutional Law,* Environmental protection. *Statute,* Construction. *Words,* "Tidelands."

Discussion of G. L. c. 91, the waterways statute, and the public trust doctrine. [342-345]

In a civil action challenging the decision of the commissioner of the Department of Environmental Protection (department) that the construction of a multiuse project was exempt from the licensing requirements of G. L. c. 91, the waterways statute, the judge erred in granting a motion for judgment on the pleadings in favor of the department and the developers, where the decision was based on a regulatory exemption promulgated by the department that exceeded its authority and relinquished its obligations under G. L. c. 91 to preserve and protect the public's rights in tidelands. [346-353]

CIVIL ACTION commenced in the Superior Court Department on May 20, 2004.

The case was heard by *Geraldine S. Hines,* J., on motions for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas B. Bracken* for the plaintiffs.

*Benjamin J. Ericson,* Assistant Attorney General, for Department of Environmental Protection.

*C. Dylan Sanders* (*Gregory P. Bialecki* with him) for North Point Cambridge Land Company, LLC, & others.

---

[1]Efekta Schools, Inc. Other plaintiffs before the Superior Court have not participated in this appeal.

[2]North Point Cambridge Land Company, LLC; East Street, Inc., doing business as Water Street Company; and Boston and Maine Corporation.

MARSHALL, C.J. The plaintiffs in this case filed a complaint in the Superior Court appealing from a decision of the Department of Environmental Protection (department) that exempted the construction of a multiuse project by the defendants North Point Cambridge Land Company, LLC; East Street, Inc., doing business as Water Street Company; and Boston and Maine Corporation (collectively, North Point) from the licensing requirements of G. L. c. 91, the waterways statute. The plaintiffs asserted that the department's decision was based on an unauthorized regulatory exemption and in excess of the department's authority. After a Superior Court judge denied the plaintiffs' motion for judgment on the pleadings and allowed the defendants' cross motion for judgment on the pleadings, the plaintiffs appealed. We transferred the case here on our own motion.

Although various arguments concerning the application of the public trust doctrine have been raised by the parties, resolution of the competing claims in this case turns on a straightforward application of principles of statutory construction. Because we conclude that the regulatory exemption promulgated by the department exceeded its authority, we reverse the decision of the trial court.

1. *Background.* North Point is the developer of a project that would turn approximately forty-eight acres of abandoned rail yards and industrial land into residential, office, retail, and park space. The site, located primarily in East Cambridge,[3] has a roughly triangular shape and is bounded on one side by the Monsignor O'Brien Highway, on a second side by the Gilmore Bridge, on which Charlestown Avenue traverses, and on the third side by the Massachusetts Bay Transportation Authority (MBTA) rail lines and a maintenance facility. The proposed project consists of five million square feet of office, retail, and residential space and the potential relocation of the MBTA Green Line Lechmere subway station. It would also expand and improve roadways, bicycle paths, and sidewalks under the Gilmore Bridge.[4]

The project site consists in part of filled tidelands. Until the early 1960's, when the Millers River flowed through the site

---

[3]Small portions of the site are located in Boston and Somerville.

[4]The original proposed project provided for a park system that included a 5.5 acre "central park." According to the plaintiffs, the 5.5 acre park has been

and into the Charles River, those tidelands were flowed tidelands. Then, under a 1962 license issued by the Department of Public Works pursuant to G. L. c. 91, the Boston and Maine Railroad (Boston and Maine) filled the site. As part of its project and as required by the terms of the license, Boston and Maine constructed underground culverts to serve the drainage function previously performed by the river. The Millers River is no longer visible and flows through the site only through the underground culverts.

General Laws c. 91 governs, among other things, water- and nonwater-dependent development in tidelands and the public's right to use those lands. Chapter 91 finds its history in the public trust doctrine, "an age-old concept with ancient roots . . . expressed as the government's obligation to protect the public's interest in . . . the Commonwealth's waterways." *Trio Algarvio, Inc.* v. *Commissioner of the Dep't of Envtl. Protection*, 440 Mass. 94, 97 (2003), citing *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 631, 645 (1979). Under the public trust doctrine, the Commonwealth holds tidelands in trust for the use of the public for, traditionally, fishing, fowling, and navigation. *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 198 (2000), and cases cited. To the extent that nonwater-dependent use — that is, nontraditional use — is to be made of tidelands, the Legislature has now expressly mandated that any such nonwater-dependent use "*shall* serve a proper public purpose" (emphasis added). See G. L. c. 91, § 18, as amended by St. 1983, c. 589, § 26.[5]

The obligation to preserve the public trust and to protect the public's interest (as mentioned in note 5, *supra*, the two are not

eliminated. Pursuant to a decision of the conservation commission of Cambridge, the "central park" space would instead be used for stormwater retention ponds to which the public would have no access. The plaintiffs have appealed from that decision to the department. The "central park" was but one of the attributes of the proposed project that, in the words of the Superior Court judge, would "benefit the public."

[5]General Laws c. 91, § 18, does not define "proper public purpose," but a "proper public purpose" should not be confused with preserving the public's rights in tidelands. Extinguishing the public's right in filled or landlocked tidelands might constitute a proper public purpose. See *Opinions of the Justices*, 383 Mass. 895, 910 (1981) ("We have no hesitancy in accepting the legislative conclusion that it is substantially in the public interest that [the

coterminous) has been delegated by the Legislature to the department, which, as charged in G. L. c. 91, § 2, "shall act to preserve and protect the rights in tidelands of the inhabitants of the commonwealth by ensuring that the tidelands are utilized only for water-dependent uses *or otherwise serve a proper public purpose*"[6] (emphasis added). General Laws c. 91, § 1, defines "[t]idelands" as "present and former submerged lands and tidal flats lying below the mean high water mark," and distinguishes between "Commonwealth tidelands" — "tidelands held by the commonwealth in trust for the benefit of the public or held by another party by license or grant of the commonwealth subject to an express or implied condition subsequent that it be used for a public purpose" — and "[p]rivate tidelands" — "tidelands held by a private party subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water." The tidelands on the North Point project site, having been filled by Boston and Maine, are now "filled tidelands." Filled tidelands are "former submerged lands and tidal flats which are no longer subject to tidal action due to the presence of fill." 310 Code Mass. Regs. § 9.02 (2000).

As part of its mandate to "preserve and protect" the public's rights in tidelands, G. L. c. 91, § 2, the department, under G. L. c. 91, § 14, may not license uses or structures in tidelands, except as authorized by G. L. c. 91, § 18, unless such structures "are necessary to accommodate a water dependent use." As to Commonwealth tidelands, such structure shall also "serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands."[7] Section 18, in turn, which was substantially amended in 1983, see St. 1983, c. 589, § 26, does allow the department to license nonwater-dependent uses of tidelands, but, pursuant to the 1983 amendments, if, and only if,

---

land discussed herein] be free from any claim of a public trust and any other vestigial interest of the Commonwealth").

[6]The relevant paragraph of G. L. c. 91, § 2, states: "In carrying out its duties under the provisions of this chapter, the department shall act to preserve and protect the rights in tidelands of the inhabitants of the commonwealth by ensuring that the tidelands are utilized only for water-dependent uses or otherwise serve a proper public purpose."

[7]General Laws c. 91, § 14, states, in relevant part: "The department may

the department has made a written determination, following a public hearing, that the structure or fill "shall serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in such lands."[8] Section 18 also allows the department to promulgate regulations for the implementation of its authority under G. L. c. 91.[9] In 1990, the department promulgated regulations as authorized by G. L. c. 91, § 18. Those regulations indicate the areas subject to licensing and permitting by the department, which include all filled tidelands in the Commonwealth "except for landlocked tidelands." 310 Code Mass.

license and prescribe the terms for the construction or extension of a wharf, pier, dam, sea wall, road, bridge or other structure, or for the filling of land or flats . . . but not, except as to a structure authorized by law, beyond any established harbor line, nor, unless with the approval of the governor and council, beyond the line of riparian ownership. . . .

. "*Except as provided in section eighteen,* no structures or fill may be licensed on private tidelands or commonwealth tidelands unless such structures or fill are necessary to accommodate a water dependent use; provided that for commonwealth tidelands said structures or fill shall also serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands" (emphasis added).

[8]Prior to 1983, G. L. c. 91, § 18, as amended by St. 1956, c. 528, did not contain any "proper public purpose" requirement for nonwater-dependent uses licensed by the Department of Public Works. See note 21, *infra.* It now states, in relevant part:

"A public hearing shall be held in the affected city or town on any license application for nonwater dependent uses of tidelands. No structures or fill for *nonwater dependent* uses of tidelands may be licensed unless a written determination by the department is made following a public hearing that said structures or fill *shall serve a proper public purpose* and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands and that the determination is consistent with the policies of the Massachusetts coastal zone management program" (emphasis added).

[9]General Laws c. 91, § 18, states, in relevant part: "*Every* license granted under this chapter shall be signed by the department, shall state the conditions on which it is granted, including, but not limited to the specific use to which the licensed structure or fill is restricted, and shall specify by metes, bounds and otherwise the location, dimensions, and limits and mode of performing the work authorized thereby. Any changes in use or structural alteration of a licensed structure or fill, whether said structure or fill first was licensed prior to or after the effective date of this section, shall require the issuance by the department of a new license in accordance with the provisions and procedures established in this chapter. . . . Licenses granted by the department pursuant to this chapter shall be revocable by the department for noncompliance with the conditions set forth therein. . . . *The department may promulgate regulations for implementation for its authority under this chapter.*" (Emphasis added.)

Reg. § 9.04(2) (1994).[10] It is this exemption of all landlocked tidelands from any and all licensing requirements that concerns us here.

In response to North Point's proposed project, the plaintiffs, in January, 2003, filed with the department a request for a determination of the applicability of G. L. c. 91 to the filled tidelands on the project site.[11] The department issued a negative determination of applicability on the basis that the site is located on landlocked tidelands and that, pursuant to the landlocked tidelands exemption discussed earlier, 310 Code Mass. Regs. § 9.04(2), the project is not subject to any licensing and permitting by the department. The plaintiffs appealed from the decision within the department, and following a hearing, an administrative magistrate issued a recommended final decision, granting summary decision to the department. That recommendation ultimately was adopted by the department's commissioner. The plaintiffs then filed their complaint in the Superior Court, appealing from the commissioner's final decision pursuant to G. L. c. 30A, § 14.[12,13]

---

[10]Title 310 Code Mass. Regs § 9.04 (1994) provides in relevant part:

"The following geographic areas, generally considered 'trust lands', are subject to licensing and permitting by the Department under 310 [Code Mass. Regs. §§ 9.00]: . . . (2) all filled tidelands, except for landlocked tidelands . . . ."

The 1990 regulation defines "landlocked tidelands" as "any filled tidelands which on January 1, 1984 were entirely separated by a public way or interconnected public ways from any flowed tidelands, except for that portion of such filled tidelands which are presently located: (a) within 250 feet of the high water mark, or (b) within any Designated Port Area. Said public way or ways shall also be defined as landlocked tidelands, except for any portion thereof which is presently within 250 feet of the high water mark." 310 Code Mass. Regs. § 9.02 (1994).

[11]The original individual plaintiffs are residents of the city of Cambridge and officers, board members, or members of the Association of Cambridge Neighborhoods. John Moot, the only individual plaintiff involved in this appeal, is the association's president. Efekta Schools, Inc., which operates an education and travel business, is an abutter to the project site.

[12]The department "assumes" that the plaintiffs meant to file their complaint pursuant to G. L. c. 30A, § 7, which provides for "judicial review of any regulation," rather than § 14. Although the plaintiffs do challenge the validity of the regulation, they also challenge the department's application of the regulation in this case and seek, among other things, an order setting aside the department's decision. Their complaint is properly brought under § 14.

[13]In their complaint, the plaintiffs contend that the department incorrectly

2. *Discussion.* We now consider the department's authority to promulgate the landlocked tidelands exemption, 310 Code Mass. Regs. § 9.04(2). We do so under familiar standards. The department has "a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation." *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 525 (1979). Where, as here, the administrative agency is vested with broad authority to effectuate the purposes of the legislation, we give deference to its expertise and experience. *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867 (1997). The principle of according weight to an agency's discretion, however, is " 'one of deference, not abdication,' and this court will not hesitate to overrule agency interpretations of statutes or rules when those interpretations are arbitrary or unreasonable." *Boston Preservation Alliance, Inc.* v. *Secretary of Envtl. Affairs*, 396 Mass. 489, 498 (1986), citing *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976) (interpretation of rules). See *Protective Life*

determined that the North Point project site tidelands are "landlocked" because the Gilmore Bridge, which forms one border of the triangular-shaped site, does not "entirely separate" the filled tidelands from flowed tidelands. The plaintiffs do not contest this issue in their appeal, focusing instead on the validity of the exemption and its application to the project site, but we briefly summarize the proceedings on this point.

If the tidelands were not landlocked, the project site would not be exempt from the licensing requirements of G. L. c. 91. In the negative determination of applicability, the department stated that the "determination as to whether an elevated public roadway, in existence as of January 1, 1984, qualifies as a landlocking structure is made on a case by case basis by the Department," and that, in this case, "even though Charlestown Avenue [which traverses the Gilmore Bridge] is an elevated public way, it serves to entirely separate the site from the Charles River, because it is low in elevation and is supported by a significant number of closely-spaced bridge piers and other at-grade structural elements."

The administrative magistrate, in his recommended final decision, agreed that the tidelands are landlocked, but rejected the department's site-specific basis for the determination, and concluded instead "that elevated public ways separate filled from flowed tidelands in the same manner as do at-grade public ways." The department's commissioner adopted the recommended final decision, but also noted that the department's "caveat" that whether something qualifies as a landlocking structure is made on a case-by-case basis is an "appropriate precaution given the complexities of Chapter 91 jurisdiction." The judge in the Superior Court affirmed the final decision of the commissioner, including, specifically, the finding that the tidelands are landlocked.

*Ins. Co.* v. *Sullivan*, 425 Mass. 615, 618-619 (1997) (interpretation of statute).

Only the Commonwealth, "or an entity to which the Legislature has delegated authority expressly, may act to further public trust rights." *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 197 (2000). "The Commonwealth may delegate, and has delegated, its authority to preserve and regulate Commonwealth tidelands to State agencies or municipalities." *Id.* at 199 n.10. See *Opinions of the Justices*, 383 Mass. 895, 913-914 (1981), and cases cited. In enacting G. L. c. 91, the Legislature delegated at least some of that authority to the department. See *Fafard* v. *Conservation Comm'n of Barnstable, supra* at 200 n.11 ("the Commonwealth's authority and obligations under [G. L. c. 91] are not precisely coextensive with its authority and obligations under the public trust doctrine"). The department, in turn, as authorized by G. L. c. 91, § 18, has promulgated regulations for the implementation of its authority under the statute. Although the plaintiffs do not dispute the department's authority, in general, to promulgate regulations, they contend that the department has acted in excess of its authority in exempting all landlocked tidelands from all licensing requirements. We agree.

General Laws c. 91 sets out to "preserve and protect," under the department's watch, the public's rights in tidelands. Those rights can only be relinquished or extinguished by the Legislature. *Trio Algarvio, Inc.* v. *Commissioner of the Dep't of Envtl. Protection*, 440 Mass. 94, 97 (2003), citing *Opinions of the Justices, supra* at 902-903, and *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 645, 646 (1979). In the first of two advisory opinions issued in response to proposed legislation relative to tidelands within the city of Boston, five Justices stated:

> "[A]cting consistently with appropriate limitations . . . the Legislature has the power to transfer or relinquish the Commonwealth's and the public's interests in tidelands within the Commonwealth. . . . Of course, whether any such transfer or relinquishment should occur, and under what conditions beyond those mandated by constitutional considerations, is a matter for the Legislature . . . ."

*Opinions of the Justices, supra* at 902.[14]

Pursuant to its power to do so, the Legislature has, in certain circumstances, relinquished or extinguished the public's rights in tidelands. See, e.g., St. 1983, c. 664, "An Act providing that a certain license to maintain existing fill or structures in certain tidewater of the Taunton River in the city of Fall River be irrevocable" (Fall River Act), and St. 1983, c. 679, "An Act relative to certain tide waters in the city of New Bedford and the rights of the commonwealth of Massachusetts therein" (New Bedford Act). When the Legislature takes such action, it does so explicitly. Both of those acts, for example, specifically "declared relinquished and extinguished subject to compliance to the use and conditions set forth [herein]" the public's rights in certain filled tidelands. St. 1983, c. 664, § 1. St. 1983, c. 679, § 1. See notes 23 & 24, *infra*. In both acts the conditions require that the use of the land still confer certain public benefits. If compliance with those conditions ceases, title to the lands "shall revert to the status held prior to the effective date of this act." St. 1983, c. 664, § 3. St. 1983, c. 679, § 3.

Unlike the Fall River and New Bedford Acts, the provisions of G. L. c. 91, which was amended in 1983 at the same time that the Legislature approved the Fall River and New Bedford Acts, contains no language suggesting that the statute is intended to relinquish or extinguish the public's right in any tidelands, filled or unfilled, landlocked or otherwise.[15] In fact the Legislature has considered, but never enacted, legislation that

___

[14]The second advisory opinion, *Opinion of the Justices*, 383 Mass. 927 (1981), submitted the same day, followed the same reasoning. The proposed legislation to which the Justices were responding in both advisory opinions was never enacted. This does not derogate the Justices' reasoning regarding legislative authority to relinquish or extinguish public trust rights.

[15]Extensive amendments to G. L. c. 91 were approved on December 17, 1983. St. 1983, c. 589. The Fall River Act (St. 1983, c. 664) was approved on December 20, 1983, and the New Bedford Act (St. 1983, c. 679) was approved on December 21, 1983. It cannot be, then, that the Legislature was indifferent to the possibility of including language in G. L. c. 91 specifically relinquishing or extinguishing rights, if that was what the Legislature desired. Further amendments to G. L. c. 91, § 18, enacted in 1986, delegated to the department the authority to promulgate regulations pursuant to the 1983 statute. St. 1986, c. 348, § 3.

would relinquish or extinguish rights in landlocked tidelands.[16] Although the department has broad discretion in the regulations that it promulgates under G. L. c. 91, § 18, see *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 524-525 (1979), the department does not have the authority to relinquish or extinguish the public's rights in any of the Commonwealth's tidelands, except on terms expressly authorized by the Legislature.

A central issue in this case therefore is whether the regulation in question, 310 Code Mass. Regs. § 9.04 (2),[17] operates either to relinquish or extinguish the public's rights in the Commonwealth's tidelands or fails to provide for a method by which the department could determine the "proper public purpose" of nonwater-dependent uses of filled land. The purpose of G. L. c. 91, and the concomitant mandate to the department, is to preserve and protect the public's rights in the Commonwealth's tidelands. Those rights, as we have already noted, traditionally involve the use of tidelands for "fishing, fowling and navigation." The public's interest in the tidelands, in other words, traditionally involves water-dependent use of the land. There is no suggestion that the proposed North Point project would involve any kind of water-dependent use. Indeed, because the tidelands on the project site are landlocked and filled, their very nature would preclude any such use. This does not, however, negate the applicability of § 18.

Pursuant to § 18, as amended in 1983, the department is authorized to license both water- and nonwater-dependent uses of tidelands, but a nonwater-dependent use (such as the North Point filled land) may *only* be licensed if such use constitutes a

[16]A bill was proposed in 1990 to amend the General Laws by adding a new chapter, 91B, entitled "An Act releasing residual rights of the commonwealth in and to landlocked lands." 1990 House Doc. No. 5815. The bill would have freed landlocked lands "of all residual rights, and all residual rights in and to all such lands" would have been "absolutely and irrevocably extinguished." *Id.* at § 3. The bill specifically stated that the owners of landlocked lands would not be subject to the licensing requirements of G. L. c. 91. *Id.* at § 5.

[17]The department's regulations were not promulgated until 1990, seven years after the 1983 amendments to G. L. c. 91, and four years after the 1986 amendment to G. L. c. 91, § 18, added the specific delegation of authority to promulgate such regulations. See St. 1986, c. 348, § 3.

"proper public purpose."[18] If landlocked tidelands are exempt entirely from the statutory licensing procedures, no opportunity exists for the department to determine, as it must under § 18, whether a proposed use of filled tidelands meets that requirement. The department has no authority to forgo its responsibility to preserve and protect the public's rights in tidelands (water dependent or nonwater dependent), whether for administrative convenience, conservation of the department's resources or any other laudable agency reason. By exempting filled "landlocked" tidelands from the statute's licensing requirements, the department is relinquishing all control over the use of the filled land. It does so without legislative authorization, effectively relinquishing all public rights that the Legislature has mandated be preserved through the licensing requirements.[19]

General Laws c. 91 does not define what constitutes a "proper public purpose" as used in § 18 of that chapter. Cf. *Opinions of the Justices, supra* at 906. But it is not our role to determine whether the proposed North Point project meets that statutory

[18]Water-dependent uses are presumed to meet the public purpose requirement. 310 Code Mass. Regs. § 9.31(2)(a) (1996).

[19]The defendants argue that there is no rational reason why the Legislature would prohibit the department from exempting landlocked tidelands from licensure but allow the department to exempt from licensure certain activities, such as a change in use in certain circumstances on filled land. See 310 Code Mass. Regs. 9.05(3). A blanket abdication of departmental oversight over all landlocked tidelands differs substantively from the express, limited exemptions contained in 301 Code Mass. Regs. § 9.05(3).

Furthermore, the only issue we are asked to address is the validity of the landlocked tidelands exemption as it exists in 310 Code Mass. Regs. § 9.04 (2). We have not been asked to hypothesize as to the outcome of this case had the department included certain activities involving the use of landlocked tidelands as a category of "activities not requiring a license or permit" under 310 Code Mass. Regs. § 9.05(3) (2000). The department's decision to exempt all landlocked tidelands from the definition of the "geographic areas . . . subject to licensing and permitting by the Department under [these regulations]," 310 Code Mass. Regs. § 9.04, is the only regulation we consider.

North Point implies that *Opinions of the Justices,* 383 Mass. 895, 910 (1981), where five Justices stated that "[n]either the public nor the Commonwealth has a continuing interest in these tidelands," carries some substantive weight that should inform our decision here. To the contrary, the fact that the Legislature declined to enact the legislation to which this advisory opinion was addressed is prima facie evidence that the Legislature has not authorized

requirement. Nothing in the 1962 license granted to Boston and Maine indicates how the licensed use constitutes a proper public purpose or otherwise protects the public's interest in the land, because at the time the license was granted, the then-applicable version of § 18 did not require either including such information in the license or making a specific finding that the use met a proper public purpose.[20] Now, however, § 18 provides that the department may license nonwater-dependent use of filled tidelands only after holding a public hearing and making a written determination that the use "shall" serve a proper public purpose. Despite the department's broad discretion to promulgate regulations, *Levy* v. *Board of Registration & Discipline in Med.*, *supra*, nothing gives the department the authority to exempt tidelands — landlocked and filled or otherwise — from the existing statutory requirement.

The department argues that it is not "surrendering public rights by declining jurisdiction" over landlocked tidelands. In similar fashion, North Point claims that an exemption from administrative licensing "does not amount to a relinquishment of any public trust rights." Beyond those conclusory statements, the defendants do not explain how a "proper public purpose" in nonwater-dependent filled tidelands could possibly be served *unless* the department retained jurisdiction over them. It is the department's licensing procedure, authorized by G. L. c. 91,

---

the department to exempt entirely landlocked tidelands from the requirement that one's use of tidelands satisfy "a proper public purpose."

[20]General Laws c. 91, § 18, as amended by St. 1956, c. 528, stated: "Every license granted under this chapter shall be signed by the department, shall state the terms on which it is granted and specify by metes, bounds and otherwise the location, dimensions and limits and the mode of performing the work authorized thereby. Before a license is granted, the department shall give notice to the aldermen or selectmen of the town where the work is to be performed that they may be heard, except that in the case of a proposed bridge, dam or similar structure across a river, cove or inlet, the department shall give notice to the aldermen or selectmen of every municipality into which the tidewater of said river, cove or inlet extends. The recital in a license that a notice required by law has been given, or that the aldermen or selectmen have not objected, shall be conclusive evidence of such facts. The department shall keep a record of each license and a plan of the work or structure. Such license shall be void unless, within one year after its date, it and the accompanying plan are recorded in the registry of deeds for the county or district where the work is to be performed."

§ 18, and as constrained by the requirements of that section, that serves to ensure the existence of a "proper public purpose" in the use of all filled tidelands. *Id.*

The department has attempted to fashion an exemption from the licensing requirements that is narrow and directed only to nonwater-dependent uses of filled tidelands. Nevertheless, by exempting such tidelands from the licensing requirements of G. L. c. 91, § 18, entirely, the department has relinquished its obligation to ensure that all nonwater-dependent uses of filled tidelands serve a "proper public purpose," as the Legislature has mandated. The exemption exceeds the department's authority and is invalid.[21]

The department has limited resources and does not believe that the de minimis impact of development on landlocked tidelands on the Commonwealth's waterways merits the regulatory burden of licensing projects thereon. See 310 Code Mass. Regs. §§ 9.00. We must give deference to the department's "expertise and experience." *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867 (1997). We must also, however, presume that when the Legislature amended G. L. c. 91, § 18, in 1983, it did so recognizing the administrative burden imposed by subjecting *all* nonwater-dependent projects on filled tidelands, landlocked and otherwise, to the licensing requirement, and that the Legislature deemed this burden acceptable for the resulting protection of the public interest. Should the Legislature decide otherwise, it may, of course, enact legislation that it deems appropriate to relinquish these public interests, as it has done on previous occasions. See, e.g., note 16, *supra.*

For more than one and one-half centuries, the Legislature has been fully cognizant of its authority to relinquish the public's

---

[21]The plaintiffs argue that the regulatory exemption also allows previously licensed uses of tidelands that have become landlocked to avoid the change-in-use provision of G. L. c. 91, § 18, which states that a change in use or structural alteration of a licensed structure or fill "shall require" a new license, issued by the department in accordance with the provisions of G. L. c. 91. Because we have determined that the landlocked tidelands exemption itself is invalid, we need not address that question, nor the additional arguments raised by the plaintiffs regarding the application of the exemption to the North Point project.

rights in tidelands by means of appropriate legislation. This authority belongs to the Legislature alone. The rights of the public in Commonwealth tidelands — filled, landlocked, or otherwise — cannot be relinquished by departmental regulation, regardless of the fact that the department has proffered potentially worthy public policy rationales in this regard.

3. *Conclusion.* Because the department has exceeded its authority by promulgating a regulation that relinquishes its obligations under G. L. c. 91, we reverse the decision of the judge in the Superior Court. Judgment shall enter in the Superior Court remanding the case to the department for further proceedings consistent with this opinion.[22]

*So ordered.*

---

[22]Because our decision results in a remand to the department for further proceedings, we need not consider the argument raised by the plaintiffs in their reply brief, and North Point's responsive motion to strike, that by applying for a license pursuant to G. L. c. 91 to build a storm drainage system under the project site, North Point acknowledges that G. L. c. 91 governs the entire project.